# EXHIBIT 1

Filed  Case 3:24-cv-00460-CHB  Document 1-2  Filed 08/08/24  Page 2 of 15 PageID #: 10
24-CI-004946  07/16/2024  David L. Nicholson, Jefferson Circuit Clerk

NOT ORIGINAL DOCUMENT
08/08/2024 11:37:38 AM
TRENT.TAYLOR@DINSMORE.C

COMMONWEALTH OF KENTUCKY
JEFFERSON COUNTY CIRCUIT
COURT CIVIL ACTION NO.

| | |
|---|---|
| **JASON FARMER**<br>15424 S. Winged Trace Ct.<br>Draper, Utah 84020 | **PLAINTIFF** |
| V. | |
| **UNITED PARCEL SERVICE CO.**<br>    PRINCIPAL ADDRESS:<br>   1400 North Hurstbourne Parkway<br>   Louisville, KY 40223<br><br>   REGISTERED AGENT:<br>   Corporation Service Company<br>   421 West Main Street<br>   Frankfort, KY 40601<br><br>**UNITED PARCEL SERVICE, INC.**<br>    PRINCIPAL ADDRESS:<br>   55 Glenlake Parkway, N.E.<br>   Atlanta, GA 30328<br><br>   REGISTERED AGENT:<br>   Corporation Service Company<br>   421 West Main St.<br>   Frankfort, KY 40601 | **DEFENDANT** |

\* \* \* \*  \* \* \* \*  \* \* \* \*

**VERIFIED COMPLAINT**

**JURISDICTION AND VENUE**

1. The Defendant's principle office is located at 55 Glenlake Parkway, N.E. Atlanta, GA 30328.

2. The Plaintiff resides at 15424 S. Winged Trace Ct. Draper, Utah 84020.

Presiding Judge: HON. MELISSA LOGAN BELLOWS (630454)

COM : 000001 of 000014

3. The Plaintiff was employed by the United Parcel Service, Inc for a period of over six months, here in Louisville, Kentucky.

4. Among other allegations alleged in this complaint, will be a charge of a violation of KRS 344.040, and as such, pursuant to KRS 344.450, this action must be and is being brought in the Circuit Court, in the county in which the alleged action arose.

5. Plaintiff's damages exceed the threshold requirement of five-thousand dollars ($5,000.00) and therefore this court has proper jurisdiction over the matter.

## FACTUAL ALLEGATIONS

6. Plaintiff hereby incorporates each and every allegation of paragraphs one (1) through five (5) above, as if fully set forth within particularity herein:

7. Mr. Farmer was hired by the Defendant, The United Parcel Service ("UPS"), on May 6, 2019.

8. Mr. Farmer is a fifty-year old pilot with nearly 27 years of experience, including 17 years as a captain. He has 13,500 hours of flight time. Additionally, Mr. Farmer had never failed a check ride, which is an FAA designated exam that pilots are required to take every six months to test competency and proficiency.

9. Mr. Farmer was born with a congenital birth defect in his hips. Because of this, Mr. Farmer required a hip replacement for both of his hips, which he gladly underwent to prepare for the next fifteen years of his career with UPS.

10. Around two months prior to starting his training at UPS, Mr. Farmer had both hips replaced so that he could be a productive employee for when he started at UPS.

11. Mr. Farmer began the 747 Qualification Training Program so that he could be

Filed  Case 3:24-cv-00460-CHB  Document 1-2  Filed 08/08/24  Page 4 of 15 PageID #: 12
       24-CI-004946    07/16/2024           David L. Nicholson, Jefferson Circuit Clerk

NOT ORIGINAL DOCUMENT
08/08/2024 11:37:38 AM
TRENT.TAYLOR@DINSMORE.C

certified to fly a Boeing 747 aircraft.

12. Due to the titanium in his hip replacements, it took longer for Mr. Farmer to get through the customs and security check points in the airport.

13. In addition to going through the metal detectors, Mr. Farmer frequently had to go through additional screening because of his hip replacements.

14. Because Mr. Farmer had to go through additional security screenings, his security searches took longer than those who were able to go through the metal detector.

15. Mr. Farmer was repeatedly verbally reprimanded for being slow and holding up the flight crew because it took him longer to get through the security.

16. Mr. Farmer was unable to control the fact that he was required to go through additional security screenings, and was a direct result of his congenital birth defect which began to affect Mr. Farmer as he aged.

17. Throughout his training, Mr. Farmer improved significantly, and received numerous positive comments. The comments recorded by UPS training personnel indicate that Mr. Farmer was studying diligently and making improvements on every flight.

18. Mr. Farmer studied the training manual authored by Boeing and UPS and followed the instructions in the manual closely. Mr. Farmer was commended for his procedures, but was often criticized for his techniques, despite the fact that the techniques employed by Mr. Farmer were required by the manual established by Boeing and UPS.

19. For example, in a training flight on November 5, 2019, training instructor Cathy

Filed  Case 3:24-cv-00460-CHB   Document 1-2   Filed 08/08/24   Page 5 of 15 PageID #: 13
24-CI-004946   07/16/2024   David L. Nicholson, Jefferson Circuit Clerk

NOT ORIGINAL DOCUMENT
08/08/2024 11:37:38 AM
TRENT.TAYLOR@DINSMORE.C

Garrick criticized Mr. Farmer for not using the vertical navigation system (VNAV) which is an automated system that keeps the aircraft at a target altitude. The VNAV will only allow the aircraft to climb towards a target altitude if the selected altitude is higher than the current altitude. Similarly, the VNAV will only allow the aircraft to descend if the selected altitude is lower than the current altitude.

20. Mr. Farmer preferred to use vertical speed, which was allowed, and debatably preferred by the Boeing manual. The vertical speed allows the pilot to set and lock a foot per minute descent, allowing maximized control over the aircraft. However, despite the fact that the Boeing manual allowed the use of vertical speed, it was frowned upon by the UPS flight instructors assigned to Mr. Farmer.

21. During the November 5, 2019 training flight, Ms. Garrick, a training instructor, pulled the aircraft off course so Mr. Farmer would have to reposition to get back to the target altitude.

22. Mr. Farmer was required to use the VNAV to reposition the aircraft to the target altitude, but because he preferred using vertical speed, a different technique, he struggled using the VNAV.

23. In the comments of the November 5 training flight, Ms. Garrick writes that Mr. Farmer was not familiar with the VNAV system, but makes no mention of the fact that he was more than capable of using the vertical speed technique to reposition the aircraft.

24. Additionally, in the comments of the November 5, 2019 training flight, Ms.Garrick criticizes Mr. Farmer for being unable to complete certain steps in the

Filed  Case 3:24-cv-00460-CHB  Document 1-2  Filed 08/08/24  Page 6 of 15 PageID #: 14
24-CI-004946   07/16/2024   David L. Nicholson, Jefferson Circuit Clerk

NOT ORIGINAL DOCUMENT
08/08/2024 11:37:38 AM
TRENT.TAYLOR@DINSMORE.C

preparation before the flight. However, Mr. Farmer was unable to complete these steps because Ms. Garrick had only given him four pages of a thirty page briefing package, making it impossible for Mr. Farmer to complete certain tasks without requisite information that would have been in the briefing package. Ms. Garrick was seemingly setting up Mr. Farmer for failure in this training flight.

25. Before the November 5, 2019 training flight, Mr. Farmer had at least six training flights with Ms. Garrick and had never had any problems with her, nor had she been nearly as critical in the comments after those flights. These criticisms arose in a late stage of training, and were used as pretext to terminate Mr. Farmer.

26. Upon information and belief, there were pilots under the age of forty, and assuredly younger than Mr. Farmer, in the training program who also received equivalent or more serious critiques and were not subsequently terminated.

27. Mr. Farmer contends that Ms. Garrick's comments on the November 5, 2019 training flight is not an accurate representation of his performance nor his overall ability displayed on the flight.

28. Mr. Farmer was also criticized for being slow when completing tasks, however, Mr. Farmer was not slow to the point of taking more than the allotted time per task. Taking the full amount of allotted time for a task does not constitute a failing offense on the Line Oriented Exam, which is an proficiency evaluation that addresses the pilot's ability to demonstrate technical skills needed to fulfill the requirements of a full flight.

29. On November 7, 2019, Mr. Farmer had his final training flight with Shane Collins. After this flight, Mr. Collins wrote an emphatic recommendation which stated that

Filed  Case 3:24-cv-00460-CHB   Document 1-2   Filed 08/08/24   Page 7 of 15 PageID #: 15
       24-CI-004946   07/16/2024        David L. Nicholson, Jefferson Circuit Clerk

NOT ORIGINAL DOCUMENT
08/08/2024 11:37:38 AM
TRENT.TAYLOR@DINSMORE.C

Mr. Farmer was a very good pilot. Further, Mr. Collins recommended that Mr. Farmer be given an additional day of ground training to improve his Crew Resource Management, but should otherwise be kept on as a pilot at UPS.

30. There were multiple instances of training in which Mr. Farmer contends that the comments on his training records were not an accurate representation of his performance. One such instance occurred on November 7, 2019 during a training simulator session in which Chris Dusse told Mr. Farmer at the intermission of the training that the flight was going well and to relax, but then in the documented comments on the flight, Mr. Dusse wrote that the flight was "fair to poor."

31. Mr. Farmer did not receive the same level of coaching and accurate feedback from training personnel that candidates under forty years of age received, as evidenced by the great disparity in written critiques after the flight compared to verbal feedback which occurred in real time.

32. Mr. Farmer did not receive the same level of coaching and accurate feedback from training personnel that candidates without a disability received, as evidenced by the great disparity in written critiques after the flight compared to verbal feedback which occurred in real time.

33. Following the positive verbal comment by Dusse, during the second half of the final simulator session, another training instructor, Shane Collins, repositioned the plane in cruise flight ten minutes prior to the descent phase. Collins distracted Mr. Farmer by stating that "Company sent an ACARS message asking to change our alternate airport to another airport" and asked Mr. Farmer to show him how to find if it was an acceptable replacement. Immediately following this inquiry, Collins

issued Mr. Farmer a different arrival clearance and in doing so referred to the clearance by a name not retrievable in the aircraft navigation database. Collins stated, "UPS 100 now cleared to Shanghai Pudong Airport ZSPD via the "Dumont twenty dash Juliet." Collins read aloud the Jeppesen chart number rather than the arrival that was retrievable on the aircraft navigation database. For the call out to contain actionable information of which a pilot could respond, Collins should have properly stated, "UPS 100 cleared direct to DUMET for the DUMET twenty-two alpha arrival into Shanghai Pudong." Mr. Farmer lost time trying to find an arrival that did not exist in the FMS. Mr. Farmer lost time as a result of the ridiculous ACARS question posed by Collins. Because of these occurrences, Mr. Farmer's overall performance and evaluation were impacted negatively, through no fault of his own.

34. During this simulator session on November 7, 2019 Collins and Dusse placed Mr. Farmer in a scenario in which he could not pass the training, through their use of improper phraseology, of which even a seasoned B747 pilot would have been unable to ascertain precise meaning, and through the issuance of an arrival to be retrieved in the aircraft database, that was in fact not retrievable. Further, the training instructors were offering no assistance and thus the flight was essentially a single pilot operation on an aircraft that is designed to be operated by two aviators.

35. Following the approach and landing, both Collins and Dusse commented on the quality of the approach and of the landing by Mr. Farmer, denoting it as nice.

36. Mr. Farmer contends that the only other pilot that was required to reposition the

Filed Case 3:24-cv-00460-CHB Document 1-2 Filed 08/08/24 Page 9 of 15 PageID #: 17
Filed 24-CI-004946 07/16/2024 David L. Nicholson, Jefferson Circuit Clerk

NOT ORIGINAL DOCUMENT
08/08/2024 11:37:38 AM
TRENT.TAYLOR@DINSMORE.C

aircraft using VNAV in training was Stan Wells.

37. Mr. Wells was the only other pilot in Mr. Farmer's training class that was over 40. Mr. Wells was also terminated from UPS.

38. On November 15, 2019, Dave Smith, the Anchorage Chief Pilot, called Mr. Farmer and informed him that UPS was terminating his employment.

39. On the same day, Mr. Farmer received a call from Carrie James, a staff attorney for the Independent Pilots Association. Ms. James told Mr. Farmer that the decision to terminate his employment was made prematurely, and that he was not being terminated.

40. However, UPS made the ultimate decision to terminate Mr. Farmer days later.

41. On February 6, 2020, Mr. Farmer was offered employment at Air Transport International out of Wilmington, Ohio. In August, 2020, Air Transport International rescinded Mr. Farmer's employment offer.

42. Mr. Farmer contends that his employment offer at Air Transport International was rescinded, in part, because UPS disclosed his training records which were not accurately representative of his performance and negatively affected by the disparate treatment he received in training; including but not limited to the fact that Mr. Farmer did not receive a full copy of the briefing package necessary to successfully complete certain tested procedures prior to take off.

## COUNT I: WRONGFUL TERMINATION: AGE DISCRIMINATION IN VIOLATION OF KRS 344.040

Plaintiff hereby incorporates each and every allegation contained in paragraphs one (1) through seventy-one (42) above, as if fully set forth with particularity herein;

Ky. Rev. Stat. Ann. § 344.040 states, in part, as follows: It is unlawful practice for an employer: (1) To fail or refuse to hire, or to discharge any individual, or otherwise discriminate against an individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age between 40 and 70; and (2) To limit, segregate, or classify his employees in any way which would deprive or tend to deprive an individual of employment opportunities or otherwise affect his status as an employee, because of such individual's age between 40 and 70.

43. Mr. Farmer was forty-nine years old on the date of his termination from UPS.

44. Mr. Farmer is a member of a protected class pursuant to the Kentucky Civil Rights Act (KCRA).

45. Mr. Farmer was terminated by UPS despite his adequate performance in training flights and on written examinations.

46. Mr. Farmer was qualified for the position of which he was terminated.

47. Mr. Farmer and another individuals, each over the age of forty (40) were terminated by UPS.

48. It is believed that Mr. Farmer's training records will show, when compared to other individuals in his class, that he was treated differently than similarly situated

employees outside the protected class because Mr. Farmer was terminated while other individuals continued their employment with UPS after receiving critiques that are either similar in nature to that of Mr. Farmer or more serious. Mr. Farmer did not receive all thirty pages of his training flight briefing package, and rather received only four pages. This was the root cause of the permissible delay in ground procedures, which was the focus of critical comments written about Mr. Farmer's performance.

49. These actions by UPS violate the statutory protections afforded by our legislature, aimed to prevent employees in Kentucky from such adverse treatment. Discrimination by the company based on Mr. Farmer's age can be evidenced through disparate treatment; allegations and facts of disparate treatment are evident throughout this Complaint.

50. There is a causal connection between Age Discrimination and the Company's decision to terminate Mr. Farmer. Mr. Farmer performed as well as similarly situated employees who were younger than he, and under forty years of age. Mr. Farmer was treated differently than similarly situated employees. Mr. Farmer received verbal reprimand by agents of UPS for his necessary participation in additional screenings at security checkpoints, which became necessary as a result of surgery to address his congenital birth defect.

**COUNT II: WRONGFUL TERMINATION: DISABILITY DISCRIMINATION IN VIOLATION OF KRS 344.040**

Plaintiff hereby incorporates each and every allegation contained in paragraphs one (1) through seventy-one (50) above, as if fully set forth with particularity herein;

Ky. Rev. Stat. Ann. § 344.040 states, in part, as follows: It is an unlawful practice for an employer: (1) To fail or refuse to hire, or to discharge any individual, or otherwise discriminate against an individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's disability (2) To limit, segregate, or classify his employees in any way which would deprive or tend to deprive an individual of employment opportunities or otherwise affect his status as an employee, because of such individual's disability or perceived disability. r. Farmer was an individual with a disability, Congenital Birth Defects in his hips, and as such he is and/or was a member of a protected classification pursuant to KRS 344;

51. Mr. Farmer was qualified to perform his duties throughout the duration of his employment by the Defendant and despite this disability, he was otherwise qualified to perform the essential functions of the job in question, either with or without reasonable accommodation;

52. Mr. Farmer's termination by Defendant constituted an adverse employment action;

53. Defendant treated employees outside Plaintiff's classification differently in terms of conditions of employment, evaluation and termination;

54. There is a causal connection between Mr. Farmer's disability and the decision by UPS to terminate his employment evidenced by the repeated verbal reprimands he received by agents of UPS as a result of his additional security screenings, made necessary because of his disability. Further, Mr. Farmer was treated differently than similarly situated employees outside the protected class, after UPS gained knowledge of his disability and the need to accommodate his disability by allotting more time to pass

through security.

55. There is a causal connection between the Disability Discrimination he received and the Company's decision to terminate Mr. Farmer. Mr. Farmer performed as well as similarly situated employees who were younger than he, and under forty years of age as well as employees who were without a disability. Mr. Farmer received verbal reprimand by agents of UPS for his necessary participation in additional screenings at security checkpoints, which only became necessary as a result of corrective surgery to address his congenital birth defect.

56. Defendants' proffered "legitimate non-discriminatory reasons" for such disparate treatment, up to and including terminating Plaintiff, if any, are mere pretext.

57. Defendant's conduct violated KRS 344;

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands in judgment:

(a) Injunctive relief in the form of an order that Defendant , cease its discriminatory practices, and reinstate the Plaintiff in comparable employment;

(b) Money damages for back pay, front pay, and humiliation and embarrassment, all in excess of the minimum jurisdictional limits of this Court;

(c) his reasonable costs, expenses, and attorney fees expended herein;

(d) Trial by Jury;

(e) And any and all other relief to which he may be entitled.

Filed            24-CI-004946    07/16/2024            David L. Nicholson, Jefferson Circuit Clerk

NOT ORIGINAL DOCUMENT
08/08/2024 11:37:38 AM
TRENT.TAYLOR@DINSMORE.C

`

Respectfully submitted,
/s/ Samel G. Hayward Jr
Samuel G Hayward Jr.
401 West Main Street #1400
Louisville, KY 40202
502-366-6456
sghayw@gmial.com

Presiding Judge: HON. MELISSA LOGAN BELLOWS (630454)

COM : 000013 of 000014

## VERIFICATION

I, JASON FARMER, have read the foregoing and the matters of fact therein set forth are true, as I verily believe.

*[signature]*
JASON FARMER

STATE OF UTAH )
)
COUNTY OF Utah )

Sworn, subscribed to and acknowledged before me, a Notary Public, within and for the _____, by JASON FARMER, this 12th day of July 2024.

My Commission Expires: January 26, 2027

JAVIER GARCIA CASIMERO
Notary Public - State of Utah
Comm. No. 728931
My Commission Expires on
Jan 26, 2027

*[signature]*
NOTARY PUBLIC
STATE AT LARGE

10